**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, | No. CV-23-00391-TUC-RCC |
| Plaintiff, | **ORDER** |
| v. | |
| Deb Haaland, et al., | |
| Defendants. | |

In 2013, U.S. Fish and Wildlife Service ("FWS") created a Proposed Rule designating 421,423 acres of critical habitat for the northern Mexican gartersnake ("MGS") and 210,189 acres for the narrow-headed gartersnake ("NHGS"). FWS01911, FWS01913. In 2020, FWS issued a Revised Proposed Rule decreasing the proposed critical habitat acreage for both species. FWS01664, FWS01667. The 2021 Final Rule designated a mere 20,326 acres of critical habitat for the MGS and 23,785 for the NHGS. FWS02336; FWS12644. Plaintiff Center for Biological Diversity's ("CBD") Complaint asserts that the final critical habitat designation was arbitrary and capricious in violation of the Endangered Species Act ("ESA") and Administrative Procedure Act ("APA"). (Doc. 1 at 1–3.)[1] The parties bring dueling motions for summary judgment. (Docs. 18, 22.) For the reasons stated herein, the Court denies CBD's Motion for Summary Judgment (Doc. 18) and grants

---

[1] Document citations refer to the documents and page numbers generated by the Court's Case Management/Electronic Case Filing system. FWS citations refer to the page number from the FWS administrative record.

Defendants Deb Haaland (Secretary of the U.S. Department of the Interior) and Martha Williams's (Director of FWS) Cross-Motion for Summary Judgment (Doc. 22).

## I.    STANDARD OF REVIEW

### 1.) Summary Judgment

"Summary judgment is a particularly appropriate tool for resolving claims challenging agency action." *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1215 (D. Mont. 2010). When the facts are undisputed, upon summary judgment, a court must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). The Court finds the administrative record establishes the facts necessary for judicial review, and it may render an opinion as a matter of law.

Review of agency decisions "is not a determination of whether there is any genuine issue as to any material fact . . . , but rather whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Good Samaritan Hosp., Corvallis v. Mathews*, 609 F.2d 949, 951 (9th Cir. 1979) (citing 5 U.S.C. § 706(2)).

Moreover, "[r]eview under the arbitrary and capricious standard is deferential." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007). The reviewing court's "role is simply to ensure that the [agency] made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). A decision is not arbitrary when "'a rational connection [exists] between facts found and conclusions made' by the defendant agencies." *Conservation Cong. v. Finley*, 774 F.3d 611, 617 (9th Cir. 2014) (quoting *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014)). Accordingly, a reviewing court should "not vacate an agency's decision unless" the agency "has relied on factors which Congress had not intended it to consider," ignored "an important aspect of the problem," explained its decision with no support from the evidence available, or the decision "is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Where the agency has relied on "relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion," its decision is supported by "substantial evidence." *Bear Lake Watch, Inc. v. Fed. Energy Regulatory Comm'n*, 324 F.3d 1071, 1076 (9th Cir. 2003). However, an agency cannot simply "ignore available studies, even if it disagrees with or discredits them." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014).

*2.) Endangered Species Act and Administrative Procedure Act*

The ESA, 16 U.S.C. § 1531, *et seq.*, "is a comprehensive scheme with the broad purpose of protecting endangered and threatened species." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1106 (9th Cir. 2012); *see also* 16 U.S.C. § 1531. When enacting the ESA, Congress was primarily concerned with "halt[ing] and revers[ing] the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Yet, the ESA was intended not only "to forestall the extinction of species (i.e., promote a species survival), but to allow a species to recover to the point where it may be delisted." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004). To address these concerns, the ESA requires federal agencies to adhere to certain procedural and substantive requirements. *Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir. 2006). One duty under the ESA requires that FWS determine a species' critical habitat concomitant to listing the species as threatened. 16 U.S.C. § 1533(a)(3)(A)(i). Critical habitat is defined as occupied areas where physical or biological features are discovered that are "[e]ssential to the conservation of the species" and that "may require special management considerations or protection;" and may include unoccupied areas if FWS makes "a determination [] that such areas are essential for the conservation of the species." 16 U.S.C. § 1532(5)(A).

The ESA's citizen suit provision empowers "any person" to "commence a civil suit on his own behalf" against "the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 1533 . . . ." 16 U.S.C. § 1540(g)(1)(C). The duties

of the Secretary are delegated to FWS under 50 C.F.R. § 402.01(b).

Like the EPA, under the APA, a party may challenge FWS's critical habitat designation. *See Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior*, 344 F. Supp. 2d 108, 118 (D.D.C. 2004). But, "[i]rrespective of whether an ESA claim is brought under the APA or the citizen–suit provision, the APA's 'arbitrary and capricious' standard applies." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011).

## II.   CRITICAL HABITAT HISTORY

### 1.) 2013 Proposed Rule

To evaluate the MGS and NHGS's critical habitat, FWS issued the 2013 Proposed Rule identifying the Physical or Biological Features ("PBFs")[2] necessary for the species' survival. FWS01901–FWS01960. Fundamentally, PBFs are "features that occur in specific areas and that are essential to support the life-history needs of the species, including but not limited to, water characteristics, soil type, geological features, sites, prey, vegetation, symbiotic species, or other features." 50 C.F.R. § 424.02.

FWS determined that both species needed habitat (1) to be located near perennial or spatially intermittent streams; (2) to have adequate terrestrial space (600 ft. on either side of a stream); (3) to have a food source consisting of native prey (and nonnative prey for the NHGS); and (4) to have an absence of nonnative aquatic predators. FWS01907; FWS01649–50. In addition, the MGS's PBF included "[l]entic wetlands such as livestock tanks, springs, and cienegas." FWS01649.

There were no comprehensive surveys available, so FWS looked at all records back to 1980, when "the first systemic survey efforts for these species across their ranges" occurred. FWS01908. Anywhere there was a gartersnake recorded and native prey present, FWS designated the entire stream "occupied." FWS01654; FWS01656. FWS utilized property boundaries to delineate areas around stock tanks or ponds. FWS13085; *see e.g.*

---

[2]  Both "Primary Constituent Elements" and "Physical and Biological Features" ("PBFs") were used in 2013 interchangeably to describe elements in a habitat that were considered essential to conservation of the species, but by 2016, only the term PBFs was used. *See* Listing Endangered and Threatened Species and Designating Critical Habitat; Implementing Changes to the Regulations for Designating Critical Habitat, 81 Fed. Reg. 7414 (Feb. 11, 2016); FWS01649. For consistency, the Court uses PBF.

FWS01925–27.

FWS received comments on the 2013 Proposed Rule suggesting the proposed critical habitat was overly broad and speculative because it included "occupied" areas with no PBFs and nonessential areas. *See* FWS12743; FWS13197; FWS13214-15; FWS13100-01. On July 8, 2014, FWS listed the MGS as threatened, therefore requiring FWS to formally designate critical habitat for the species "to the maximum extent prudent and determinable." FWS02336.

### 2.) 2020 Proposed Rule

#### i.   Ephemeral Streams

The reduced critical habitat in the 2020 Revised Proposed Rule resulted from FWS's reassessment in four main areas. First, FWS examined and defined three types of streams: (1) perennial streams (streams that flow year-round); (2) spatially intermittent streams (streams that are "interrupted, perennially interrupted, or spatially intermittent"); and (3) ephemeral streams (streams that are typically dry until rainfall). FWS01650; FWS02035. FWS found perennial and spatially intermittent streams were used by both species. FWS01650; FWS02035. However, FWS determined that purely ephemeral streams did not provide habitat for either species, but that the MGS may use an ephemeral stream connecting two perennial parts of a stream or two bodies of water (e.g. stock tanks and wetlands). FWS01650; FWS02035. Therefore, FWS concluded that ephemeral reaches were not critical habitat unless they connected two bodies of water and were considered occupied at the time of listing. FWS01650; FWS02035. FWS designated ephemeral reaches of streams linking areas with water as critical habitat for the MGS under PBF 7. FWS01650.

#### ii.   Overland Areas

Second, FWS reevaluated overland areas, noting that in 2013, information about species' use was limited. FWS01653. FWS asserted evidence did not suggest that either species was present in overland areas or that there were PBFs contained within them to support habitat. FWS2038-39; FWS023464–67 (citing to 85 FR 23608, April 28, 2020) (MGSs "have not been detected in overland areas outside of stream floodplains, and while

they likely use these areas while moving between habitats, specific habitat attributes in these areas that are essential to the snakes have not been identified."). Therefore, FWS excluded any pure overland grassland from critical habitat unless it was near streams or vegetated corridors. FWS01654.

### iii. Terrestrial Habitat Along Streams

Third, FWS adjusted the species' critical habitat based on new data and comments regarding the species' use of terrestrial space along streams. FWS01652. FWS found the prior critical habitat limitation to 600 feet on either side of an occupied stream "does not accurately capture the lateral extent of terrestrial habitat used by either species." FWS01652. For instance, FWS noted the lateral distance of critical habitat could be farther from a stream if the terrain was surrounded by steep slopes "but this additional distance is vertical, not horizontal, from the stream bank." FWS01652. To more accurately reflect species use of terrestrial habitat, FWS modified the proposed critical habitat "to include the wetland or riparian zone adjacent to a stream or lentic water body, whichever is greater." FWS01652; FWS02339 (utilizing riparian zone "more accurately captures areas used by the [MGS] for thermoregulation, shelter, foraging opportunities, brumation, and protection from predators"). For the NHGS, FWS included land along streams with aquatic/terrestrial features up to 89 feet from a water's edge, which encompassed the maximum distance NHGSs were observed from a stream. FWS01652.

### iv. Occupancy Criteria

Fourth, shifting occupancy criteria impacted the species' critical habitat. In 2013, FWS considered an entire stream occupied any part of the stream "was within the historical range of the species, contained aquatic and terrestrial [PBF] components . . . , had at least one record of the species dated 1980 or later, and had at least one native prey species present." (FWS01654.) FWS received comments indicating these parameters were overly broad. (FWS01654.)

### v. Species' Lifespan and Dispersal Distance

For the 2020 Revised Proposed Rule, FWS reassessed species' occupancy based on scientific records showing the gartersnakes' lifespan was approximately 15 years.

FWS12654–55. Given the new lifespan information, FWS indicated, "[i]t is reasonable to conclude that areas surveyed within 15 years of listing with no detection of the corresponding gartersnake species were not occupied at the time of listing." FWS01654.

In addition, FWS estimated the species' greatest known dispersal distance was 2.2 miles up or downstream from a known observation record. FWS01656. Accordingly, FWS designated habitat "occupied" if it was 2.2 miles up or downstream from a known observation record, "contains all PBFs for the species," and "a last known record of occupancy is 1998 or later." FWS01654.

Furthermore, FWS excluded all unoccupied habitat, noting that unoccupied areas may only be considered critical habitat if (1) occupied areas were insufficient, (2) designation is reasonably certain to "contribute to the conservation of the species," and (3) "the area contains one or more of the PBFs . . . ." FWS 02343. FWS explained that it was not including unoccupied areas as critical habitat because "we have not identified any unoccupied areas that meet the definition of critical habitat. We are not aware of any other areas within the historical range of the species that maintain perennial water, have suitable prey, and support an aquatic community that is not dominated by nonnative predators." FWS01661. FWS then received comments on the 2020 Proposed Rule. FWS12645; FWS02445.

### 3.) 2021 Final Rule

The Final Rules designating critical habitat for the MGS issued on April 28, 2021, and October 21, 2021 for the NHGS. FWS02336; FWS12644. After reviewing comments, the 2021 Final Rule reduced critical habitat for the MGS by 687 acres. FWS02337. FWS also increased critical habitat for the 5,081 acres for the NHGS based on new information that NHGSs over-wintered up to 328 feet from the edge of a body of water. FWS12645.

FWS explained that "not all of [the MGS's] historical range will be essential to the conservation of the species." FWS12656. FWS indicated that based on the evidence before it, FWS could not determine with a reasonable certainty any unoccupied areas that were "essential for the conservation of the species." FWS12656. Compared to the 2013 Proposed Rule, the 2021 Final Rule excluded about 6,769 acres for the MGS and 508 acres for the

NHGS. FWS02337, FWS02353; FWS12645; FWS12659–12660. As a result, the 2021 Final Rule preserved 20,326 acres of critical habitat for the MGS and 23,785 for the NHGS. FWS02336; FWS12644.

## III.     CENTER FOR BIOLOGICAL DIVERSITY'S MOTION FOR SUMMARY JUDGMENT

CBD's motion for summary judgment argues the 2021 critical habitat designation was arbitrary and capricious because FWS did not rely on the best available science; ignored aspects of the problem; and the decision lacked a rational connection to the evidence. (Doc. 19.) Specifically, CBD argues the 2021 Final Rules:

1) Ignored the best available scientific evidence regarding gartersnake habitat use of ephemeral streams and overland areas.

2) Imposed unnecessarily rigid and unscientific criteria for "occupancy" (including the 1998 cut-off, PBFs, and low nonnative species requirement).

3) Excluded all unoccupied critical habitat areas without a reasonable or scientifically supported explanation, disregarding evidence of the species' genetic peril and the functional necessity of such areas.

4) Justified major reductions of protected habitat and methodological changes with speculation rather than data or science.

5) Applied the superseded 2019 critical habitat regulation to unoccupied areas, which was subsequently abandoned for being at odds with the ESA's conservation goals.

6) Failed to adequately explain departures from prior policy and ignored or failed to respond to well-founded scientific comments and evidence.

(*Id.*)

## IV.     FWS'S CROSS-MOTION FOR SUMMARY JUDGMENT

FWS's Cross-Motion argues the 2021 Final Rules relied on the best available science to designate occupancy more precisely and to exclude unoccupied habitat. (Doc. 23 at 22.) Moreover, FWS contends that the Final Rules identified PBFs and criteria for occupancy before deciding critical habitat. (*Id.*) Finally, FWS claims that CBD's critique of FWS's critical habitat designation is myopic, and "relies only on the comments submitted by itself and one expert to attempt to undermine the 2021 Final Rules," while

overlooking FWS's consideration of all comments, and the 110 studies/documents regarding the MGS and 91 studies/documents regarding the NMGS. (*Id.* at 14, 22.)

## V.    BEST AVAILABLE SCIENCE—STANDARD OF REVIEW

Review of an agency decision requires courts to be "most deferential" when agencies make determinations within their areas of expertise. *Forest Guardians v. U.S. Forest Serv.*, 329 F.3d 1089, 1099 (9th Cir. 2003). A court may not "substitute [its] judgment for the agency's in determining which scientific data to credit, so long as the [agency's] conclusion is supported by adequate and reliable data." *Finley*, 774 F.3d at 620. The best available science "merely prohibits [an agency] from disregarding available scientific evidence that is in some way better than the evidence [it] relies on." *Kern Cnty. Farm Bureau v. Allen*, 450 F.3d 1072, 1080 (9th Cir. 2006).

Specifically, the critical habitat designation must be based on "the best scientific data available [] after taking into consideration the economic impact, the impact on national security, and any other relevant impact . . . ." 16 U.S.C. § 1533(b)(2). "The purpose of the best available science standard is to prevent an agency from basing its action on speculation and surmise." *San Luis & Delta-Mendota Water Auth.*, 776 F.3d at 995. However, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider serious reliance interests." *Encino Motorcars, LLC v. Navarro*, 579 U. S. 211, 221–22 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U. S. 502, 515 (2009) (quotation marks omitted). In essence, there must be "a rational connection between the facts found and the determinations made." *Ariz. Cattle Growers Ass'n v. Salazar*, 606 F.3d 1160, 1163 (2009).

### 1.) Reduction in Ephemeral Streams

CBD argues FWS erred when it (1) determined that purely ephemeral streams do not provide habitat for the MGS, and (2) concluded that NHGSs are not present in ephemeral reaches because there is no prey base. (Doc. 19 at 30–31.) CBD claims these determinations were arbitrary and ignored the best available science provided by itself and

gartersnake expert Dr. Erika Nowak. (*Id.*)

Dr. Nowak and CBD's comments asserted that ephemeral stream segments that do not connect to perennial streams should be included in critical habitat because they are used seasonally by both species. FWS13296; FWS13332–33 (citing 85 Fed. Reg. 23637 (April 28, 2020); FWS13296; FWS13300.

However, FWS did not exclude *all* ephemeral streams. The 2021 Final Rule for the MGS included both intermittent and ephemeral streams with certain attributes:

> We explain that streams that have perennial or spatially intermittent flow can provide stream habitat for the species. Ephemeral reaches of streams can serve as habitat for northern Mexican gartersnakes and are included in critical habitat as PBF 1 in streams with spatially intermittent flow if such reaches are between perennial sections of a stream that were occupied at the time of listing. We also include entirely ephemeral channels in critical habitat as PBF 7 if they connect perennial or spatially intermittent perennial streams to lentic wetlands in southern Arizona where water resources are limited. Streams that have ephemeral flow over their entire length are considered critical habitat when they may serve as corridors between perennial streams and lentic aquatic habitats, including springs, cienegas, and natural or constructed ponds that were occupied at the time of listing due to the propensity for higher prey densities where water conveys.

FWS02346. FWS also "removed upstream end reaches of streams that are ephemeral . . . based on FCode attribute of the flowline layer in the USGS National Hydrography Dataset or information from peer review and public comments." FWS12663.

FWS explained that ephemeral streams did not provide species habitat because of the lack of prey base and connectivity to water, so FWS limited critical habitat in ephemeral streams to reaches that connected two bodies of water. FWS12660; FWS01650: FWS2038; FWS02346. FWS made reasonable exceptions, acknowledging that wetted intermittent regions "may provide greater foraging opportunities during low flow periods" for the NHGS. FWS12658. Because the MGS moved on land under dense vegetative cover, and ephemeral areas provided such cover, FWS also included ephemeral reaches that linked to other aquatic features. FWS02045–46.

Moreover, studies showed both species are highly aquatic, rely on the water for their

prey, and do not travel far from water sources. *See e.g.*, FWS02038 (observing MGS discovered in wetted floodplains and near stream channels); FWS14074 (indicating that MGS were generally found near water "and never moved more than 5 m from the water," therefore it was logical to "expect them to remain within the margins of aquatic, or riparian habitats"); FWS22496–97 ("In Arizona, nearly all [NHGSs] were found in the water or on the banks of larger streams" and "feed[] on aquatic prey, primarily fish"); FWS14618 (finding the NHGS "is highly aquatic" and that "[r]iver reaches characterized by broad expanses of small rock and sand, and streams that cut through meadows, do not appear to be suitable habitat for [the NHGS]"); FWS14556–57 (noting discovery of "first observations of [NHGS] using interrupted and seasonally intermittent stream reaches," but stating the NHGS "is typically found in permanent, cool, clear, rocky streams with riffles, pools, and streamside vegetation");  FWS21588 (stating telemetered NHGSs "had small ranges" and "were frequently found within 100m of the water's edge"); FWS22366 (stating the MGS "lives in permanent rivers, streams, and springs" and "[t]he most important habitat characteristics . . . were permanent water, dense bank and aquatic vegetation, and an abundance of frogs, toads, and small fish," and that the NHGS eats fish and "lives in sizeable streams and rivers . . . primarily in and around partly or entirely submerged rock-boulder complexes at and near the junction of riffles and pools"); FWS20696 (suggesting NHGS could use a variety of habitats, but also indicating 433.33 meters was "the largest distance traversed" and that the NHGS were typically located near aquatic habitat).

FWS's conclusion that purely ephemeral streams do not provide habitat for either species was justifiable and was supported by the best available evidence. FWS included areas used to connect water sources, areas where the species had been spotted foraging, and areas that provided appropriate groundcover. FWS considered CBD and Nowak's comments, but drew reasonable conclusions based on all of the evidence. The Court will not question FWS's expertise and finds FWS's conclusion was "supported by adequate and reliable data." *See Finley*, 774 F.3d at 620. CBD's disagreement with FWS's analysis does not render the decision arbitrary or capricious.

*2.) Elimination of Overland Areas*

Next, CBD argues that the exclusion of all overland areas from the MGS's critical habitat was arbitrary and capricious because it "ignored the agency's own recognition that such habitat is essential for various life-cycle functions." (Doc. 19 at 32.) CBD claims FWS eliminated overland habitat based on pure speculation, admitting there was no additional evidence of how the species used overland areas and presuming the species did not use overland grassland between aquatic features. (*Id.*) In addition, CBD asserts that FWS failed to address studies and comments by Dr. Nowak "showing the important life-cycle functions supported by these overland areas." (*Id.* at 33.)

"Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that [they are] changing position, and consider serious reliance interests." *Encino Motorcars, LLC*, 579 U.S. at 221–222 (quoting *FCC*, 556 U. S. at 515) (quotation marks omitted).

In response to comments, FWS admitted that the 2013 calculation of overland critical habitat was not based on actual use of the land by the species, but by property boundaries around stock tanks. FWS01653. In addition, FWS indicated only a small percentage of the property boundaries had PBFs essential to the species' survival. FWS01653; FWS02038. Thus, FWS believed the former boundaries for protected overland area did not correlate to any known information about gartersnake use. FWS01653.

Since 2013, FWS stated studies suggested that when a gartersnake traveled, it did so protected by vegetative groundcover. FWS01654; FWS25986; FWS22771 (stating vegetative groundcover important for active season); FWS02346–47 (MGS "have not been detected in overland areas outside of stream floodplains, and while they likely use these areas while moving between habitats, specific habitat attributes in these areas that are essential to the snakes have not been identified"); FWS02140–42 ("the underlying characteristic [of habitat where MGSs are found] appears to be dense vegetation or other natural structural components that provide cover for the species"); FWS14872 (MGS "used plots with 0–50% ground cover less than expected, particularly plots with the least amount

of ground cover (one occupied plot and 26 reference plots), and used plots with 76–94% ground cover more than expected"); *see also* FWS22761 ("Emmons and Nowak (2016) found that [MGS] selected sloped areas at aquatic edges with dense emergent vegetation"). Because evidence suggested MGSs used vegetative cover (found in ephemeral reaches) when traveling, but not grasslands (found in overland area), purely overland areas were not included as critical habitat. FWS2038–39; FWS2045–46. In addition, FWS included specific areas as essential instead of broadly stating all overland areas were essential. This included terrestrial land near water for lifecycle functions in PBFs 1C and 6. FWS02339; FWS02354. Moreover, for the NHGS, FWS considered information that NHGSs over-wintered up to 328 feet from water's edge and increased terrestrial critical habitat accordingly. FWS01652.

In addition, FWS addressed Dr. Nowak's concerns about critical habitat for life cycles. The 2021 Final Rule for the MGS stated the "terrestrial habitat adjacent to the stream channel" in PBF 1C includes land with "riparian vegetation, small mammal burrows, boulder fields, rock crevices, and downed woody debris" that "provides areas for thermoregulation, shelter, foraging opportunities, brumation, and protection from predators." FWS02347. In addition, FWS included critical habitat for species' dispersal along "stream lengths" including "all known maximum longitudinal lengths of home ranges for the species." FWS02347.

FWS's conclusions about overland areas were reasonable. With the limited information available, FWS acknowledged that the 2013 proposed designation of critical habitat around property boundaries had no correlation with species' use. In addition, FWS realigned the boundaries to better account for habitat that correlated with water boundaries and vegetative groundcover. FWS acknowledged and explained its change in position, considered the available evidence, and addressed Dr. Nowak's comments. When a plaintiff "points to no data that was omitted from consideration" the challenge to best available evidence cannot prevail. *Kern*, 450 F.3d at 1080.  The Court cannot conclude this determination was arbitrary or capricious.

*3.) Limitation on Occupancy*

First, CBD claims FWS arbitrarily determined that gartersnakes lived 15 years and therefore would not consider records prior to 1998 when determining whether an area was occupied. (Doc. 19 at 34.) CBD suggests this was a "back-of-the-envelope calculation" with no evidentiary support. (*Id.*) Moreover, CBD claims the 15-year calculation is flawed because of "the highly-secretive nature of these snakes (which makes them very difficult to observe and document), the inevitable variation in survey effort across the vast habitat range (not to mention areas likely to be occupied that have not been surveyed since 1998), and the fact that new populations are in fact frequently discovered where there were no recent sitings." (*Id.* at 35.)

An "area is occupied if the species 'uses [it] with sufficient regularity that [the species] is likely to be present during any reasonable span of time." *Ctr. for Biological Diversity v. USFWS ("CBD v. USFWS")*, 67 F.4th 1027, 1035 (9th Cir. 2023) (quoting *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1165). "Relevant factors may include how often the area is used, how the species uses the area, the necessity of the area for the species' conservation, species characteristics such as degree of mobility or migration, and any other factors that may bear on the inquiry." *Ariz. Cattle Growers' Ass'n*, 606 F.3d at 1164. The determination of whether a habitat is occupied must be made "based on the occupancy status at the time [the species] is listed." *CBD v. USFWS*, 67 F.4th at 1039 (quotation marks omitted). The determination is "highly contextual and fact-dependent" and FWS is afforded deference in making such an occupancy determination. *Ariz. Cattle Growers Ass'n*, 606 F.3d at 1164–65.

In the 2020 Proposed Rule, FWS observed that its definition of occupancy differed significantly from other FWS documents that defined whether the MGS was "extant" (still in existence) or "extirpated" (eradicated) in a given area. FWS01654. For instance, in the 2013 Proposed Rule, FWS "considered a gartersnake species extant . . . if it had been reported in an area in the past 33 years regardless of negative survey efforts or threats precluding occupancy." FWS01654. At the time, FWS justified the use of such remote

- 14 -

occupancy recordings because the species were "secretive" and "difficult to detect." FWS12654–55.

FWS defined "'extirpated' as that there have been no individuals reported for a decade or longer at a site within the historical distribution of the species, despite survey efforts, and there is no expectation of natural recovery at the site due to the presence of known or strongly suspected causes of extirpation." FWS01654. The 2020 Proposed Rule explained, stating:

> Understanding longevity of a species can inform how long we can reasonably expect a species is still extant in an area, regardless of detection probability. The oldest estimated northern Mexican gartersnake is between 14 and 16 years old . . . . Narrow-headed gartersnakes may live up to 10 years or longer in the wild [and approximately 16 years in captivity] . . . . Based on this information, we estimate maximum longevity for each gartersnake species is 15 years, so that it is reasonable to conclude that a gartersnake detected in 1998 or later represents a population that could still be present at the time of proposed listing in 2013, depending on the extent of threats in the area.

FWS01655; FWS022040.

FWS narrowed its definition of occupancy because the longest known lifespan for the species was 15 years and the furthest a snake of the same genus had been subsequently spotted was 2.2 miles from the original observation location. FWS01655–56; FWS02341. FWS considered the secretive nature the species, and indicated that the lack of surveys made the occupancy evaluation difficult. FWS12654–55. However, FWS noted that survey efforts had become more exhaustive since the 1980s. FWS02340. FWS then reasonably determined that the best available evidence included: existing records, expected lifespan, "subsequent surveys in areas that had no detection of the corresponding gartersnake species," and new threats that may affect occupancy. FWS02039–40. In addition, FWS's occupancy determination was in response to comments stating that occupancy was overbroad because it included entire streams where the species had been spotted since 1980 and included lands that had no PBFs. FWS02339–40. But, if there were PBFs in the areas between two areas where the species were spotted, FWS included the connecting length as

critical habitat. FWS12663. Furthermore, FWS amended occupied territory to include 328 feet from water's edge after FWS obtained information that NHGSs over-wintered this distance. FWS12654. CBD is discontented that FWS simply restated its reasoning from the 2020 Proposed Rule in the 2021 Final Rule (Doc. 19 at 24); however, FWS's reaffirmation does not render its evaluation was arbitrary and capricious.

Second, CBD argues in the 2020 Proposed Rule, FWS erroneously created stricter guidelines requiring all PBFs be present for an area to be considered occupied. (*Id.* at 20–21 (citing FWS01656).) CBD claims the PBF requirement of low non-native species eliminated many "streams, stream reaches, and lentic water bodies" that would have otherwise been considered occupied. (*Id.* at 21.) The best evidence, CBD believes, is Dr. Nowak's observation that nonnative species have impacted the gartersnakes, but that in some circumstances studies show that gartersnakes can live in areas dominated by nonnative species. (*Id.* at 22). "The best available science does not support excluding potential or occupied habitat based on the habitat containing an abundance of non-native predators." (*Id.* (citations and quotation marks omitted).) CBD claims FWS has not responded to these comments and offered only a reiteration of its justification in the 2020 Proposed Rule. (*Id.*)

FWS counters that it responded to CBD's concerns by including both native and nonnative prey. (Doc. 23 at 36 (citing FWS02036 ("[W]e are removing the requirement for a wholly native prey base and including the additional prey species described above in PBF 3."); FWS02036 (including nonnative prey); FWS12260 (same).) FWS delineates PBF 4, explaining that it relates to nonnative *predators*, not prey. (Doc. 23 at 37.) For predators, FWS found a correlation between populations that had declined from one survey to another, and the increase in nonnative predators. (*Id.* (citing FWS02356; FWS12655).) This informed FWS's decision to exclude areas that had an abundance of nonnative predators. (*Id.* at 37–38 (citing FWS02365; FWS12663).)

CBD's argument amounts to a difference of opinion, but FWS considered CBD and Dr. Nowak's comments, and FWS's conclusions are not arbitrary. In designating critical

habitat, FWS included areas with native and nonnative prey. In addition, FWS evaluated evidence about areas with nonnative predators, determining that the higher the level of nonnative species, the less likely the garternakes were able to thrive. FWS therefore reasonably included critical habitat in areas with low levels of nonnative aquatic predators and degraded areas that required special management. *See* FWS02365; FWS12663; FWS02340.

### 4.) 2019 Critical Habitat Regulation for Unoccupied Areas

CBD recapitulates that "[u]nder the now-superseded 2019 regulations, the Secretary was allowed to consider unoccupied areas to be essential to the conservation of the species only where a designation based on occupied areas alone was inadequate and where, in addition, the Secretary 'determined that there is a reasonable certainty both that the area will contribute to the conservation of the species and that the area contains one or more of those physical or biological features essential to the conservation of the species.'" (Doc. 19 at 48 (citing 50 C.F.R. § 424.12(b)(2) (2019)). CBD argues "[t]his approach runs contrary to the purposes of the ESA and cannot support a lawful critical habitat designation." (*Id.*) CBD claims that "FWS may not promulgate and apply regulations that frustrate the ESA's clear conservation purpose" and that "FWS's recent regulatory amendment and the explanations underlying those changes lay bare the fact that even FWS now views the two-step approach to unoccupied habitat contained in the 2019 regulations—and its application to decisions . . . as patently inconsistent with the ESA's text and purposes." (*Id.* at 50.)

This is a facial challenge to the 2019 regulations that was not included in the Complaint. *See Willis v. City of Seattle*, 943 F.3d 882, 886 (9th Cir. 2019) ("A facial challenge is an attack on a law itself as opposed to a particular application.") (quoting *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015)). As such, the Court will not consider it.

### 5.) Exclusion of Unoccupied Areas

CBD then argues that FWS's exclusion of all unoccupied areas ignored CBD and Dr. Nowak's concerns that poor genetic health and low population of the species required

critical habitat to include unoccupied areas. (Doc. 19 at 24–25.) Both believed that limiting critical habitat to only occupied areas would contribute to the species' extinction. (*Id.* at 25.) CBD claims FWS did not address the "most extensive genetic study" available, the 2018 Wood *et al.* study, which noted the low genetic diversity of the species that "recommended genetic management and translocation strategies" to reduce the risk of extinction. (*Id.* at 26.)

FWS may include unoccupied areas as critical habitat if FWS makes "a determination [] that such areas are essential for conservation of the species." 16 U.S.C. § 1532(5)(A). The designation of unoccupied critical habitat "is a more demanding standard than that of occupied critical habitat." *Home Builders Ass'n of N. Cal. v. FWS*, 616 F.3d 983, 990 (9th Cir. 2010). Under the 2019 regulations in effect at the time, unoccupied territory must be "essential" for species conservation, and the area must contain one or more PBFs. 50 C.F.R. § 424.12(b)(2) (2019). "While 'conservation' encompasses both ensuring species' survival and recovery, the ESA nonetheless requires the agency to show that designation of critical habitat is 'necessary' or 'indispensable' in accomplishing these objectives, not merely 'beneficial' to or capable of 'promoting' survival or recovery." *CBD v. USFWS*, 67 F.4th at 1038.

CBD explained why previously designated critical habitat was deemed unoccupied and nonessential in the 2021 Final Rules. Addressing CBD and Dr. Nowak's concerns, FWS explained:

> We are not aware of any other areas within the historical range of the species that maintain perennial water, have suitable prey, and support an aquatic community that is not dominated by nonnative predators. Therefore, although there may be a future need to expand the area occupied by one or both gartersnake species to reach recovery, there are no unoccupied areas that are currently essential to the species conservation and that should be designated as critical habitat.

FWS01661.

FWS acknowledged CBD's concerns about isolation and declining populations; however, FWS concluded that "not all of its historical range will be essential to the

conservation of the species," and because of limited knowledge about which unoccupied areas were necessary for the conservation of the species, finding the areas that were "essential," not simply beneficial, to recovery was not possible. FWS02348.  In deciding to exclude unoccupied areas, FWS also considered (1) comments that the habitat was overly broad and (2) evidence that the 2013 Proposed Rule included 277,875 acres of overland that did not contain PBFs essential to the MGS's conservation. FWS0238. As FWS points out, and the 2018 Wood *et al.* study acknowledges, "little is known about the genetic diversity in existing populations, information that is useful in designing recovery plans . . . . At present, too little is known about the population genetics of either gartersnake species to make informed conservation management decisions that would further protect and maintain maximum genetic diversity and historical population structure." FWS13398.

CBD's displeasure with FWS's determination does not equal a failure to address CBD's concerns. FWS acknowledged that genetic diversity, low population, and a need for land for dispersal was important, but also acknowledged that based on the best available evidence, determination of unoccupied land essential to the preservation of the species was not possible. The Court cannot find this conclusion arbitrary or capricious.

**VI.    CONCLUSION**

FWS relied upon the best available evidence and its critical habitat designation was not arbitrary or capricious. The 2021 final critical habitat designation relied on approximately 200 studies and documents related to the gartersnakes, and considered not only CBD and Nowak's concerns, but all comments. CBD disagrees with FWS' critical habitat determination, but FWS provided rational support for their change. Where it had limited information, FWS limitations were well reasoned, relying on substantial evidence regarding occupancy, traveling distance, and PBFs.

///

///

///

///

- 19 -

Accordingly, IT IS ORDERED:

1) CBD's Motion for Summary Judgment is DENIED. (Doc. 18.)

2) Defendants' Cross-Motion for Summary Judgment is GRANTED. (Doc. 22).

3) This matter is DISMISSED. The Clerk of Court shall docket accordingly and close the case file.

Dated this 27th day of March, 2026.

_____

Honorable Raner C. Collins
Senior United States District Judge